

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable John D. Reed, Commissioner
Bureau of Labor Statistics
Austin, Texas

Dear Sir:

                    Opinion No. O-4760
                    Re: Validity of Texas Women's
                        Hour Law as applied to the
                        employment of women clerks
                        by railroads engaged in
                        doing business in interstate
                        commerce.

        In your recent letter addressed to this department
you state that various railroads operating within the State
of Texas and doing business in interstate commerce are em-
ploying many women in their offices. Places in which you
are interested are those where women are employed in the
various accounting departments such as car record clerks,
who make up, or assist in making up, various periodical re-
ports. More particular duties include the operation of
various tabulating and accounting machines, the work be-
ing of a statistical nature.

        You request the opinion of this department as to
whether the Texas Act regulating the hours of labor of women
employed by railroads in the types of work above mentioned
apply to such women when the railroads so employing them
are engaged in doing business in interstate commerce. If
the Texas Act does apply in such cases, then you wish to
know if such Act has been superseded by the Federal Hour of
Service Act or the Federal Railway Labor Act, wherein an
agreement is entered into between the railroad and such
women employees with respect to hours of service pursuant
to said Act.

        The Texas Act referred to was adopted in 1915 and
is now Articles 1569 to 1572, inclusive, of the Texas Penal
Code as amended in 1933, being commonly referred to as the
Women's Labor Law. Article 1569 reads in part as follows:

        "No female shall be employed:

NO COMMUNICATION IS TO BE CONSTRUED AS A DEPARTMENTAL OPINION UNLESS APPROVED BY THE ATTORNEY GENERAL OR FIRST ASSISTANT

"1. In any factory, mine, mill, workshop,
mechanical or mercantile establishment, hotel,
restaurant, rooming house, theater, moving picture
show, barber shop, beauty shop, road side drink
and/or food vending establishment, telegraph,
telephone or other office, express or transpor-
tation company, or any State institution, or any
other establishment, institution or enterprise
where females are employed, for more than nine
(9) hours in any one (1) calendar day nor more
than fifty-four (54) hours in any one (1) cal-
endar week."

Some related provisions follow but the quotation
above is thought to be sufficient for this purpose.

Obviously the employment of women whose duties
are of the kind and type which you mentioned are included
within the Texas Act. In the absence of Federal legislation
in conflict therewith, the Texas Act is applicable.

In the United States Supreme Court case of Erie
Railroad v. New York, 233 U. S. 671, 58 L. Ed. 1149, 34 S.
Ct. 756 (1914) the court stated:

". . . The relative supremacy of the state
and national power over interstate commerce need
not be commented upon. Where there is conflict,
the state legislation must give way. Indeed,
when Congress acts in such a way as to manifest
its purpose to exercise its constitutional au-
thority, the regulating power of the state ceases
to exist. . . (citing authorities)."

Therefore the question here is not as to the power
of Congress to regulate and to exclusively occupy the field
covered by the Texas Women's Labor Law as it may apply to
women employed by railroads engaged in doing business in
interstate commerce, but whether it has, in fact, done so.

The Federal Act of March 4, 1907, C. 2939, 24 Stat.,
1415, 45 U.S.C.A., Sections 61 and 62, referred to as the
Hours of Service Act regulates the number of hours certain
employees engaged in doing business in interstate commerce
may work. In carefully chosen words the Act described an
employee as a person who is "actually engaged in or connected
with the movement of any train", and the hours of service
feature of the Act only applies to such described persons.

Honorable John D. Reed, Commissioner, Page 3

Manifestly, then the Federal Hours of Service Act, being limited within its scope, does not apply to women employed as accountants, bookkeepers, clerks, nor to general office assistants, such as are mentioned in your letter, as they are not "actually engaged in or connected with the movement of any train."

In an effort to prevent interruption of interstate commerce by strikes or lockouts resulting from disputed between carriers and their employees, Congress enacted the Railway Labor Act, the Act of May 20, 1926, c. 347, 44 Stat. 577, as amended by the Act of June 21, 1934, c. 691, 48 Stat. 926, 1185, and the Act of June 25, 1936, c. 804, 49 Stat. 1921, 45 U.S.C.A., Sections, 151-163.

In determining whether the Railway Labor Act was designed to regulate the hours of service of women employees of railroads engaged in doing business in interstate commerce we must look to the provisions of the Act and the authorities wherein that Act has been construed.

In Virginian Ry. Co. v. System Federation No. 40, (Va. 1937) 57 S. Ct. 592, 300 U. S. 515, 81 L. Ed. 789, the United States Supreme Court said:

"The power of Congress over interstate commerce extends to such regulations of the relations of rail carriers to their employees as are reasonably calculated to prevent the interruption of interstate commerce by strikes and their attendant disorders. Wilson v. New, 243 U. S. 332, 347, 349, 61 L. ed. 755, 773, 774, 37 S. Ct. 298, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024. The Railway Labor Act, ¶ 2, declares that its purposes, among others, are 'To avoid any interruption to commerce or to the operation of any carrier engaged therein,' and 'to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules or working conditions.' The provisions of the Act and its history, to which reference has been made, establish that such are its purposes, and that the latter is in aid of the former. What has been said indicates clearly

that its provisions are aimed at the settle-
ment of industrial disputes by the promotion
of collective bargaining between employers and
the authorized representative of their employees,
and by mediation and arbitration when such bar-
gaining does not result in agreement. It was
for Congress to make the choice of the means by
which its objective of securing the uninterrupt-
ed service of interstate railroads was to be
secured, and its judgment, supported as it is
by our long experience with industrial disputes,
and the history of railroad labor relations, to
which we have referred, is not open to review
here.

"The means chosen are appropriate to the
end sought and hence are within the congression-
al power. . ."

The Railway Labor Act fails to mention "hours of
service" of employees of railroads. It might therefore be
contended that Congress, in enacting the Railway Labor Act,
was not unmindful of the Hours of Service Act, previously
enacted, which regulated the number of hours certain railroad
employees might work. To have permitted hours of service
of railroad employees to be a matter subject to dispute be-
tween railroads and their employees in the Railway Labor
Act would have been to have completely nullified many of
the effective provisions of the Hours of Service Act. This,
manifestly, Congress did not intend to do.

If Congress, in enacting the Railway Labor Act,
had intended to regulate hours of service it would have
been an easy matter to have expressed this intention in
clear, distinct and unambiguous language. Since Congress
has not expressly manifested its purpose to exercise its
constitutional authority to regulate hours of service in
the Railway Labor Act, it then remains to look for such
regulation by implication. The primary basis for the con-
tention that Congress intended to regulate hours of service
in the Railway Labor Act is found in Section 151a of the
Act as follows:

"The purposes of the chapter are: . . .
(4) to provide for the prompt and orderly settle-

Honorable John D. Reed, Commissioner, Page 5

ment of all disputes concerning rates of pay, rules, or working conditions; . . ."

In Missouri Pac. R. Co. v. Norwood, 42 F. (2d) 765, a bill was filed seeking to enjoin the Attorney General of the State of Arkansas and other prosecuting attorneys of that State from prosecuting the plaintiff railroad for violation of the "full crew" train statute of that state governing the operation of freight trains. The railroad's contention was that Congress had occupied the field by enacting the "Railway Labor Act". There the court said:

"Plaintiff contends that Congress has occupied the field of these Arkansas statutes in the Labor Act of 1926 (44 Stat. 577 (45 USCA § § 151-165)). It is argued that Congress, in that act, took over control of 'working conditions' of employees of interstate carriers and that 'working conditions,' as there used, includes the number of men required in train and switching crews. In a sense, the number of men required to perform a task is one of the 'working conditions' of that task. However, such meaning is not necessarily included in such expression. Therefore, it is necessary to construe this act to determine if such meaning is to be found therein. This act is the latest of a line of congressional legislation having the same general purpose. Prior acts are the Act of June 1, 1898 (30 Stat. 424), Acts of July 15, 1913 (38 Stat. 103 (45 USCA § § 101-125)), and the Transportation Act of 1920, § § 300-316 (41 Stat. 456, 469 (45 USCA § § 131-146)). The purpose of each of these acts was to prevent interruption of interstate commerce by strikes or lockouts resulting from disputes between carriers and their employees. The general method of each of these acts is to provide a medium or machinery for peaceful, orderly settlement of such disputes. In each the subject-matter of dispute is defined in general terms; these terms are similar in all of the acts. The Acts of 1898 (30 Stat. 424, 425) and of 1913 (38 Stat. 103, 104) include in such definition 'conditions of employment.'

The Transportation Act (41 Stat. 456, 470, 471) includes 'working conditions' and 'standards of working conditions.' The Railway Labor Act of 1926 (44 Stat. 577, 578, 580, 582) includes 'working conditions.' Obviously, these terms in each of these acts have the same general meaning. They mean such conditions affecting the work of the employees as might be the subject of agreement between the carriers and the employees. This could not include matters of statutory duty, for such are withdrawn from the volition of either party. Also, if Congress intended to occupy the field in the Labor Act of 1926, it had already, by the use of similar language, done so in 1898, yet the Supreme Court, in 1911 (Chicago, R. I. & P. R. Co. v. Arkansas, 219 U. S. 463, 31 S. Ct. 275, 55 L. Ed. 290) and 1916 (St. Louis, I. M. & S. R. Co. v. Arkansas, 240 U. S. 518, 36 S. Ct. 443, 60 L. Ed. 776) decided these very statutes of Arkansas were in a field not occupied by national legislation." (Emphasis ours)

The United States Supreme Court in affirming the decree of the Federal District Court in the Norwood case, supra, (286 U. S. 249, 76 L. Ed. 1010) said:

"No analysis or discussion of the provisions the Railway Labor Act of 1926, U.S.C.A. Title 45, Sec. 151, is necessary to show that it does not conflict with the Arkansas statute under consideration."

The regulation of hours of service of labor of women employees is clearly within the police power of the State of Texas. We find nothing in the provisions of either the Hours of Service Act or the Railway Labor Act tending to impair the validity of the Texas Women's Labor Law as it may affect the employment of women engaged in the types of work mentioned. "The intention of Congress to exclude states from exerting their police power must be clearly manifested." Reid v. Colorado, 187 U. S. 137, 148, 23 S. Ct. 92, 47 L. Ed. 108; Savage v. Jones, 225 U. S. 501, 533, 32 S. Ct. 715, 56 L. Ed. 1182.

It is therefore the opinion of this department, and you are so advised, that the Federal Railway Labor Act does not impair the validity of the Texas Women's Labor Law, but that same is valid and enforceable insofar as it may affect the hours of service of women employed by railroads engaged in doing business in interstate commerce with the exception of those women, who, in isolated instances may be "actually engaged in or connected with the movement of any train." The women employed in offices performing the types of work mentioned are not within the exception.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By *E. G. Pharr*

E. G. Pharr
Assistant

EGP:LM

APPROVED OCT 2, 1942

*Gerald C. Mann*

ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN